## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MORDY'S APPLIANCE REPAIR SERVICE LLC** | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES AND INJUNCTION (15 U.S.C. §§ 1, 15)** |
| **AMAZON SERVICES LLC,** | |
| Defendant. | **(JURY TRIAL DEMAND, *infra*)** |

**Also serve:**

CORPORATION SERVICE COMPANY
80 STATE STREET
ALBANY, NEW YORK, 12207-2543

Plaintiff Mordy's Appliance Repair Service LLC brings this action under the Sherman Act, 15 U.S.C. 1, 15 et seq., for damages and injunctive relief, based upon its personal knowledge as facts pertaining to it, upon the investigation of its counsel, and upon information and belief.

1

# OVERVIEW[1]

1.  Search engines (Google), online retail platforms (Amazon), and social networks
    (Facebook) have acquired a high level of market concentration in recent years, to the extent
    that leading Internet platforms have non-temporary market power in their respective
    domains.  This litigation challenges Amazon's *use* of its market power in restraining
    competition amongst hundreds or thousands of small-business sellers on its platform-based
    Marketplace at amazon.com.  Due to the dimensions of competition in which online retail
    sales occur in the United States, Amazon now has and *exercises improperly* the power to
    determine winners and losers in the economic struggle for a piece of Amazon's 6,000,000
    sales per day.

2.  Amazon Services LLC operates the website amazon.com, which is a retail marketplace
    through which Amazon (*qua* seller) and third-party sellers offer products for sale. Third-
    party sellers who offer products through amazon.com enter into a contract with Amazon, to
    which agreement both parties are bound.  (Amazon Services, Business Solutions
    Agreement, or "BSA").  Under BSA third-party sellers are entitled to list a product they
    own on the website's product detail page, **regardless of whose intellectual property
    images etc. appear thereon,**[2] where numerous offerors/offerings compete for numerous

---

[1] On May 21, 2007, the Supreme Court decided *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,
127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007), in which it considered "what a plaintiff must
plead in order to state a claim under § 1 of the Sherman Act."  Since *Twombly,* the course of
antitrust litigation has been uniformly predictable, with defendants conducting microscopic
studies of what they invariably conclude are "threadbare allegations." In light of the foregoing,
we will provide the context of Amazon's alleged wrongdoing at some length.

[2] https://www.amazon.com/gp/help/reports/infringement

customers simultaneously.  Amazon (*qua* service provider) is compensated through various fees that touch every transaction made by third-party sellers in the Amazon Marketplace,[3] e.g. Monthly subscription fee, Selling fee, Per-item fee, Service fee, High-volume listing fee, Refund administrative fee.

3.      Amazon Seller Central is the web interface used by merchants to manage and view their orders. One who sells via Seller Central is considered a marketplace or third-party seller.[4] Sellers may be "individual" or "professional," with the latter typically utilizing Amazon's Fulfillment by Amazon ("FBA") division.  FBA provides fee for service, e.g. storage, packing, shipping, and customer service for products in the FBA program.

4.      A second sales program, Amazon Vendor Central, is the web interface used by manufacturers and distributors. One who sells via Vendor Central is called a first-party seller or Producer. First-party sellers act as suppliers, selling in bulk to Amazon under one or more contractual documents. Items provided by Producers to Amazon are generally marketed as "Ships from and sold by Amazon."  Registration on Vendor Central is by invitation only.[5]

5.      Some brands simultaneously utilize Seller and Vendor accounts, meaning that Amazon and such brands have both supplier-seller and horizontal-competitor relationships in the relevant market at one and same time.

---

[3] https://www.amazon.ca/b/?node=13653457011
[4] Seller Central hosts a forum on which Amazon third-party sellers who, based on personal experience, are witnesses to events at suit. Forum comments are made in the ordinary course of business and are available online.  Amazon controls the forum space.  Plaintiff has quoted many witness statements from such forums that provide support for the Complaint's allegations. Citations to Seller Central's texts, all of which cited matter is incorporated herein, will ordinarily have "https://sellercentral.amazon.com/forums" in the URL.
[5] http://content26.com/blog/amazon-vendor-central-v-seller-central/

6.  Amazon provides an expansive Amazon's A-z Guarantee as to products purchased on the Marketplace, essentially promising a refund whenever a customer is displeased by reason of defective or non-conforming product:

> About A-to-z Guarantee
>
> We want you to buy with confidence anytime you make a purchase on the Amazon.com website or use Amazon Pay; that's why we guarantee purchases from third-party sellers when payment is made via the Amazon.com website or when you use Amazon Pay for qualified purchases on third-party websites. The condition of the item you buy and its timely delivery are guaranteed under the Amazon A-to-Z Guarantee.

https://www.amazon.com/gp/help/customer/display.html?nodeId=201889410.

7.  Amazon and certain sellers—often the holders of intellectual properties associated with brands and products ("rightholders")—have in recent years developed methods of unlawfully restraining competition in the online market for retail sales.  Such methods invariably require concerted action by Amazon and the rightholders, with both parties misusing intellectual property rights and/or agreeing to boycott disfavored third-party sellers or specified products that such third-party sellers seek to list and sell on the Amazon Marketplace.   Elimination of discounters and discounted products from access to the Marketplace by joint collaborative action, directly at issue here, is a per se violation of the Sherman Anti-Trust Act.  *United States v. Gen. Corp*., 384 U.S. 127, 129, 86 S. Ct. 1321, 1322 (1966) ;  *United States v. Apple, Inc.,* 791 F.3d 290, 322 (2d Cir. 2015); *Feminist Women's Health Ctr., Inc. v. Mohammad*, 415 F. Supp. 1258 (N.D. Fla. 1976)

8.  Typically, the objects of the restraints at issue are "grey market goods."  As will be described in detail hereinafter, "grey market goods" (as used herein) are often deeply discounted goods found at Walmart , Staples, liquidations or other deal sources.  Such goods ordinarily carry or are sold under the trademark, copyright or other intellectual

4

property of the rightholder.  Although downstream purchasers may lawfully deal in grey

market goods, Amazon and competitors often combine to eliminate grey goods

competition.

9.    Due to Amazon's anticompetitive arrangements with trademark/copyright holders in

particular, Sellers have been restrained by Amazon's Seller Performance Team from

listing, or required to de-list, a wide range of products in the Marketplace.

10.    Plaintiff Mordy's Appliance Repair Service LLC has concerns about three species of

systematic Group Boycotts or Concerted Refusals to Deal:

- **Restricted Brands**: There are many product brands, with the list ever
  expanding, that third party sellers are not permitted to list or sell on the
  Marketplace.  Some brands are restricted from sale in the Marketplace with an
  anticompetitive motive and by means of concerted action by brand owners
  and Amazon. A common scenario is that Amazon agrees to deny the use of
  the Marketplace to price-cutting competitors of Amazon and/or favored third-
  party sellers, as the case may be, in exchange for which Amazon is permitted
  to retail the brand's products on negotiated terms.  "Deals" of this sort are
  well known and documented. See episodes: Nike discussed *infra* at ¶¶109 et
  seq.; Logitech discussed *infra* at ¶¶37 et seq.; National Football League
  discussed *infra* at ¶¶116 et seq.
- **Restricted Products/Categories**:  As with brands, products and product
  categories may be restricted from listing as a matter of standing policy for
  anticompetitive reasons and by means of concerted conduct of Amazon and
  favored sellers.   See episode of Apple iPod covers, discussed *infra* at ¶87.
- **De-listed Products**: Amazon works in concert with favored sellers to limit
  competition for designated products, *after they are purchased by a disfavored
  seller and listed without objection or restraint by Amazon*. One device is a
  form published by Amazon for "use by intellectual property rightholders and
  their agents to notify Amazon of alleged intellectual property infringements
  such as copyright and trademark concerns."[6]  Amazon, in concert with

---

[6] https://www.amazon.com/gp/help/reports/infringement.  Such forms often purport to be issued
under the Digital Millenium Copyright Act ("DMCA"), prescribing a procedure for rightholder
notification of alleged infringer to cease and desist.  However, the Act does not permit
unreasonable restraints on competition, let alone violations of the Sherman Act and other public
policies. E.g. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990).

rightholders, has often misused this form and protocol as a pretext for limiting competition specifically, and contrary to Amazon's written policies, by accepting purported reports of infringement at face value and using them as justification for de-listing legitimate offerings while ignoring the alleged infringer's right to re-sell lawfully acquired grey market goods.[7]

11.   The motivating purpose of Amazon's alleged Marketplace restrictions is often to stifle and restrain competition unlawfully.  Such restraints, which are practiced routinely and in plain view, adversely affecting hundreds or thousands of individual sellers, and violate Antitrust, Copyright and Trademark laws.  In addition to damages, Plaintiff seeks declaratory and injunctive relief so as to free the Amazon Marketplace of such unlawful restraints, thus permitting Plaintiff (potentially) and other Amazon sellers to exercise their statutorily protected privilege to compete.

## JURISDICTION AND VENUE

12.   Plaintiff's claims arise and are brought under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

13.   This Court has jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331in that this action arises under federal antitrust laws.

14.   Venue is proper in the Southern District of New York pursuant to 15 U.S.C. § 22 as Defendant transacts business in the Southern District of New York, generating millions if not billions of dollars from online retail sales to businesses and individuals resident of the Southern District of New York.  Defendant Amazon Services LLC registered with the New York Secretary of State on May 16, 2008 (DOS ID# 3672974).  Amazon's business

---

[7] This official Amazon policy discussing restricted products may be found at https://www.amazon.com/gp/help/customer/display.html?nodeId=200277040

operations in this District include the maintenance of a 50,000 square-foot warehouse in mid-town Manhattan on 34th Street, stocked with tens of thousands of Marketplace items and dozens of employees, all of which has been in place since at least 2015. Amazon has hundreds of employees in the New York City market,[8] and is slated to open a roughly 975,000 square foot fulfillment center on Staten Island, employing thousands of workers, by summer's end.[9]

## NATURE OF INTERSTATE TRADE AND COMMERCE

15. In addition to being a products retailer, Amazon now operates nationwide as a marketing platform, a delivery and logistics network, a payment service, a credit lender, an auction house, a major book publisher, a producer of television and films, a fashion designer, a hardware manufacturer, and a leading host of cloud server space.

16. Amazon generates annual U.S. product sales revenues in the range of $80 billion.

## SUMMARY OF AMAZON'S ANTICOMPETITIVE CONDUCT

17. Amazon itself sells about ½, and third-party sellers sell about ½, of the items sold in the Marketplace in the United States. Amazon is thus (i) both a supplier of Marketplace services to and a direct competitor, when products are "sold by Amazon," of other sellers seeking to sell the same exact products, and (ii) a co-conspirator of complaining third-party sellers who, as horizontal competitors of disfavored sellers, demand (and achieve with Amazon's participation) a takedown of the latter's lawful listings.

---

[8] https://www.glassdoor.com/Salary/Amazon-New-York-City-Salaries-EI_IE6036.0,6_IL.7,20_IM615.htm
[9] http://nypost.com/2017/06/19/new-yorkers-are-getting-faster-shipping-thanks-to-amazon/

18.  When Amazon grants or terminates Marketplace selling privileges to a seller, it impacts the nature of relevant market intra-brand and inter-brand competition in the products and category(ies) of products, as the case may be, that the seller seeks to market in the Marketplace.  Further, Amazon's actions impact competition beyond the Marketplace, e.g. zappos.com and nike.com sell Nike footwear . . . and, because of their recent "deal," no longer need meet the challenge of discounted product in the Marketplace.  See discussions of Nike, *infra* at ¶¶109 et seq.

19.  Amazon is generally permitted to unilaterally restrict any seller from competing in the Marketplace and take such other unilateral actions as Amazon in its business judgment deems appropriate; but Amazon is *not* free to agree with one Marketplace seller (or its supplier) to restrict or exclude from competition another seller or such seller's relevant products.  Such concerted behavior, which occurs regularly vis-à-vis the Marketplace, is a horizontal group boycott or concerted refusal to deal.

20.  Several facts combine in this case, rendering appropriate the application of the Quick Look Doctrine and/or *per se* liability under the Antitrust Laws, to wit:

- Amazon possesses market power (i) in the relevant market of online retail sales and (ii) in related markets,  according to some experts,  monopoly or monopsony power
- Amazon owns and controls, exclusively, the essential facility for conducting online retail sales in the United States, i.e. its platform, amazon.com
- Amazon contravenes its own formal policies in implementing the conspiracies at suit
- The conspiracies are aimed at discounters who or which bring consumer prices down
- The conspiracies are premised upon joint collaboration and understandings to deny competitors relationships and Marketplace access needed in the competitive struggle
- The conspiracies often rely on the misuse of intellectual property rights, pretextually, as the trigger for market exclusion
- Amazon refuses to use readily available, less drastic measures than those it uses, pretextually, to eliminate accused infringers
- Amazon acts arbitrarily such that victims of the conspiracies often cannot identify any reason for their misfortune and have no procedural safeguards with which to obtain recourse

**PLAINTIFF'S EFFORTS TO COMPETE IN THE MARKETPLACE**

21.  Plaintiff Mordy's Appliance Repair Service LLC is a New Jersey LLC, a potential
     competitor in the Marketplace, has been engaged since 2013 in the appliance repair
     business, and regularly transacts business online. Plaintiff's management has lately noted
     that some of the company's customers, who have historically hired Plaintiff to repair their
     appliances, have begun repairing their appliances by themselves with the assistance of
     online tutorials on YouTube and other websites.[10]  Understanding that such customers and
     other potential customers nationwide must acquire parts and components in order to repair
     their appliances, Plaintiff has decided to evolve its business to online sales.

22.  Plaintiff's managing member received formal instruction in 2016 as to establishing a so-
     called storefront on Amazon and utilizing FBA as logistics support.  Plaintiff has opened a
     UPS account, as Amazon partners with UPS and provides favorable terms to Amazon
     sellers. Plaintiff is adequately funded from available operating funds to commence
     contemplated Marketplace operations and enjoys established, years-long banking and
     supplier relationships and terms.  Plaintiff has the business hardware and facilities, e.g.
     weighing and measuring equipment for packages, smartphone, computer resources,
     financial system software, and invoicing software requisite to selling on the Marketplace.

23.  Plaintiff's initial business plan is to sell appliance parts/accessories  and consumer
     electronics/accessories in the Marketplace as a Professional Seller.  Plaintiff ascertained
     that Amazon represents publically that all of Plaintiff's anticipated product offerings fall
     within "open categories," i.e. generally requiring no specific approval prior to listing the

---

[10] See
https://www.google.com/search?client=safari&rls=en&q=youTube+appalince/elctronics+repairs
&ie=UTF-8&oe=UTF-8 (Electronic items plays a big role in our routine life.)

products in the Marketplace.[11] Plaintiff reviewed listings on camelcamelcamel.com with a view to identifying actual sales data and, hence, profit opportunities. Plaintiff has inventory he seeks to list and sell on the Marketplace.

24. Plaintiff's pro forma concept for its first six months in a neutral Marketplace is as follows: Average brand name item cost is anticipated at approximately 60% of average target sale price of $40, yielding average net profit of 15% ($6) on brand name item (assuming fees to Amazon of ($10). Assuming an investment of $10,000, which Plaintiff has readily available for the endeavor, with an inventory turnover of 45 days, Plaintiff would sell about 300 items per month ($12,000), generating monthly profit of $1,800. Amazon's current restrictions prevent Plaintiff from freely trading brand name items in this and other categories.

25. During the process of setting up an Amazon account, Plaintiff reviewed the form BSA and, prior to agreeing to the BSA, studied a number of seller central forums, some of which are cited herein. Plaintiff learned that some Amazon sellers have suffered significant financial loss when Amazon de-listed product offerings following unsubstantiated complaints from competing sellers, often rightholders or those purporting to be so, alleging that the products of the grey market seller—here, potentially Plaintiff-- were counterfeit or otherwise unlawful. E.g. https://www.cnet.com/news/amazon-seller-sues-amazon-apple-over-deleted-listings/ Plaintiff's acceptance by Amazon as a Professional Seller was a virtual certainty, had Plaintiff executed BSA and taken the additional ministerial steps to signup.

---

[11] https://services.amazon.com/services/soa-approval-category.htm/ref=asus_soa_gs_cat :"While listing in the Consumer Electronics, Electronics Accessories, Music, Software & Computer Games, and Video Games & Video Game Consoles categories is generally open to all sellers, specific products may require pre-approval."

26.   Plaintiff's managing member emailed Amazon on Amazon's designated, proprietary email

template found in Amazon's account-opening pages, on June 26, 2017, requesting

assurances that Plaintiff could confidently purchase significant additional inventory without

fear of its product offerings being de-listed by Amazon upon the unsubstantiated claims of

strangers:

> Before signing up I would like to know that my investment in inventory
> will not be lost because of Amazon taking down my listings.  I understand
> that sellers sometimes complain about other seller listings and Amazon de-
> lists products without checking.  I buy only from completely legitimate,
> authorized sellers. Will Amazon agree with me to allow my listings to
> remain listed unless and until, which would never happen, a complaining
> seller or purchaser proves, and Amazon examines my product in
> Amazon's own fulfillment center, that a product held under my account is
> really illegal, which would never happen?

27.   Amazon promptly responded to Plaintiff's request: "Thank you for your interest in Amazon

Services.  We will review your inquiry and contact you within two business days."

However, Amazon did not contact Plaintiff as it committed to do.

28.   Uncertain as to Amazon's intent to respond to Plaintiff's query, Plaintiff next sent a copy

of his above email, in the form of a letter, to Amazon Services LLC, on July 5, 2017.

Amazon has never responded to either of Plaintiff's overtures to become an Amazon seller.

29.   Amazon's refusal to address Plaintiff's inquiry was intentional, calculated and unjustified,

as Amazon knew or should have known—because Plaintiff clearly told Amazon in every

way it could—that Plaintiff wished to be an Amazon seller but was not prepared to enter

the relevant market for online sales absent a reasonable comfort level that Amazon would

not wrongfully remove Plaintiff's FBA product listings.

30. Amazon's acts and omissions above-described have harmed and will continue to unfairly harm competition in the relevant market by barring Plaintiff and other rivals from entering and/or competing effectively in the Marketplace.[12]

31. Such harm to competition and competitors (i.e. exclusion of competitors) is the type of harm the antitrust laws were enacted to forestall, and flows from that which makes Amazon's conduct unlawful (i.e. concerted action).  Specifically, Defendant's exclusionary conduct, ASIN by ASIN, product by product, category by category and brand by brand, has directly prevented Plaintiff from becoming a competitor on amazon.com, an essential facility without which Plaintiff cannot compete for sales in the online retail sales relevant market.

### THREATENED ANTICOMPETITIVE CONDUCT

32. Amazon has engaged in horizontal misconduct across the spectrum of retail products including, *inter alia,* in the product categories in which Plaintiff seeks to compete.

33. "Within the consumer tech space, the fastest-growing devices are portable wireless speakers, fitness wearables, wireless headphones, and smart TVs, according to the Consumer Technology Association."   Amazon is ascendant in this sub-market.[13]

34. Plaintiff seeks to compete, for example, in the market for wireless headphones and other fast-growing devices on amazon.com but, absent assurances of reasonable and lawful

---

[12] Exclusionary conduct is 'that which prevents actual or potential rivals from competing or impairs their opportunities to do so effectively**."** *Walgreen Co. v. AstraZeneca Pharm., L.P.,* 534 F. Supp. 2d 146, 150 (D.D.C. 2008) (quoting Phillip E. Areeda & Herbert Hovenkamp, 3 Antitrust Law, § 650a(1) at 67 (rev. ed. 1996)). "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Microsoft Corp.*, 253 F.3d at 58 (alteration in original).

[13] https://qz.com/712709/amazon-will-soon-dethrone-best-buy-as-the-top-seller-of-consumer-electronics/

conduct by Amazon, Plaintiff cannot invest resources in additional inventory earmarked for the Marketplace.

35. Not only has Amazon restricted numerous brands of consumer electronics upon notice to third-party sellers, e.g. "Beats by Dre" entire line of headphones, but Amazon arbitrarily restricts multitudinous products, ASIN by ASIN, as seller comments on Seller Central attest throughout this complaint, *post-investment* and *without any notice* whatever.

36. By way of five (5) examples out of hundreds, Amazon is a *competing seller*, i.e. horizontal ("Sold by Amazon") competitor of other sellers—and potentially of Plaintiff-- on the product detail page, of some of the hottest electronic products in the Marketplace, including Beats headphones (B01LZK4QRU), Belkin Universal Home Charger (B00BE68IYE), Apple Lightning Digital AV Adapter (B009WHV3BM), Netgear 300 Wi-fi Range Extender (B00L0YLRUW), Jabra Bluetooth headset (B0727QFFCC).  As of July 2017, Apple, Beats, Belkin and Jabra[14] were restricted brands.[15]  Netgear sends warning notices to discounters,[16] and Amazon cancels selling privileges of sellers who stand their ground.[17]

## A PRIMARY PRETEXT: MANUFACTURERS WARRANTIES

37. As a sixth example in the consumer electronics category, Logitech, a worldwide seller of consumer electronic accessories, "designs personal peripherals to help people enjoy a better experience with the digital world."  In or about July of 2014 Logitech began "clamping down" on grey market sales of Logitech products, telling grey market sellers that they were

---

[14] https://www.sellerlift.com/what-is-brand-gating-and-how-does-it-impact-you-as-an-amazon-seller/
[15] See http://selleressentials.com/amazon-restricted-brands/
[16] https://sellercentral.amazon.com/forums/message.jspa?messageID=3133667
[17] https://sellercentral.amazon.ca/forums/thread.jspa?messageID=3850497

tortiously interfering with exclusivity restrictions in Logitech's agreements with its authorized distributors.

38. Amazon, despite knowing Logitech's position was erroneous as per Amazon's policies in ¶89 below, issued and issues takedown notices to grey market sellers reported to Amazon by Logitech.

39. After July 2014, to justify such anticompetitive conduct, Logitech developed the pretext that Logitech does not honor warranties on its own manufactured products unless purchased from authorized dealers and, hence, the products could not be listed as "New" on Amazon, i.e. they were not the "same exact product" according to the pretext.  In fact, Logitech and most manufacturers *do* honor warranties as to purchases from unauthorized sellers, provided the consumer has purchase documentation.

40. Logitech's website does not state that a product must be purchased from an authorized dealer in order to enjoy the manufacturer's warranty;[18] nor does the Warranty as published elsewhere so state.[19]  The warranty extends by its terms to the "original purchaser."  *Id.*  A consumer who removes a product from a sealed package purchased online reasonably deems herself to be the "original purchaser."  Amazon's reasoning behind the  de-listing and gating of Logitech products is purely pretextual.

41. Amazon generally regards items as the "same exact products" whether or not they are purchased from authorized dealers and regardless of manufacturers' warranty applicability. Such products typically appear on the ASIN's detail page. As a matter of policy, Amazon

---

[18] http://www.logitech.com/en-us/footer/terms-of-use?id=3101
[19] http://groupon.s3.amazonaws.com/editorial-images/Groupon%20Goods/Goods%20Warranties/Logitech%201%20Year%20.pdf

does not regard the absence of manufacturer's warranty coverage as a disqualifier, as per its written policy:[20]

> About Manufacturer Warranties
>
> If you'd like a copy of the manufacturer's warranty for a product found on Amazon.com, you can contact the manufacturer directly or visit their website for more information.
>
> ---
>
> Manufacturer's warranties may not apply in all cases, depending on factors like the use of the product, where the product was purchased, or who you purchased the product from. Please review the warranty carefully, and contact the manufacturer if you have any questions.

42.   When it comes to listing its own merchandise vis-a-vis the A-z Guarantee, Amazon itself uses less restrictive methods than Marketplace exclusion for products that do not carry the so-called "A-z Guarantee" that accompanies all products sold in the Marketplace. For example, Amazon's Zappos division sells Nike footwear, advertised on the same page with purported competitors in the Marketplace, with the following product page disclosure:

> **Zappos.com**(www.zappos.com)
> Not eligible for A-to-z Guarantee

There is no lawful justification for boycotting third-party sellers instead of, at most, requesting that their listings contain language similar to the language Amazon uses when listing Nike footwear on Zappos.  Amazon's Nike/Zappos adjustments demonstrate that de-listing of products is not required by differing warranty terms.  Less restrictive measures are demonstrably available and their non-use, i.e. to justify exclusionary practices, is unlawful.  See *K.M.B. Warehouse Distribs. v. Walker Mfg. Co*., 61 F.3d 123 (2d Cir. 1995). Although Amazon's listing policies expressly allow product details to be included in all

---

[20] https://www.amazon.com/gp/help/customer/display.html?nodeId=468516

listings, Amazon does not permit unflavored sellers to save their listings—their livelihoods—through this simple expedient.

43.   Notwithstanding Amazon's policy of listing millions of products by hundreds of thousands of sellers who are non-authorized . . . and notwithstanding Amazon's above quoted "About Manufacturer Warranties" [21] . . . Amazon seeks to anchor its pretextual use of the Manufacturers Warranty market exclusion justification with an second policy, ambiguous as it disjoins the warranty issue from the definition of "New," that favors favored sellers seeking to eliminate competition:

> "New: Just like it sounds. A brand-new, unused, unopened item in its original packaging, with all original packaging materials included. Original protective wrapping, if any, is intact. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments."

https://www.amazon.com/gp/help/customer/display.html?nodeId=1161242

44.    Amazon's pretextual Manufacturer Warranty Policy Rule is routinely vacated for favored sellers.  *Id.*  Accordingly, given Amazon's official notice to buyers that a manufacturers warranty may not apply to products they purchase, the exclusionary policy is nothing more than a "cover" for anticompetitive conduct against unflavored sellers.

45.   Amazon is a direct seller of Logitech products on the Marketplace.[22]  Plaintiff seeks to compete in the consumer electronics/accessories category on the Marketplace.  Amazon's concerted activities with Logitech to date preclude the competition that Plaintiff could

---

[21] " . . . the unauthorized sale of 'genuine' goods is exploding on the Internet. Just look at a typical page on Amazon and hit the link to other offerings of 'new' versions of the product on the Amazon Marketplace.  https://www.americanbar.org/publications/blt/2014/07/01_payne.html
[22] https://www.amazon.com/Logitech-Wireless-Performance-Mouse-Large/dp/B002HWRJBM/ref=sr_1_2?s=electronics&ie=UTF8&qid=1499187030&sr=1-2

inject into the marketplace vis-à-vis Logitech products.  Amazon and Logitech have jointly

collaborated to exclude competitors in a way that the antitrust laws were designed to

prevent.[23]  Any alleged fact to the contrary is mere pretext and, further, is more restrictive

as a restraint on competition than Amazon need implement to meet any legitimate business

purpose.[24]

### DEFENDANT AMAZON SERVICES LLC

46.   Amazon Services LLC is a Nevada limited liability company with its primary place of

business in Seattle, Washington. Plaintiff communicated and sought to communicate with

Amazon Services LLC regarding the matters at suit.  Non-party Amazon Corporate LLC is

the parent of Amazon Services LLC. Non-party Amazon.com, Inc., a Delaware corporation

with principal place of business in Seattle, Washington, is the ultimate parent of all of the

foregoing.   The amazon.com marketplace ("Marketplace") is owned and operated by

Amazon Services LLC.  Plaintiff reserves the right to amend, joining additional Amazon

parties as appropriate.

47.   Certain sellers on amazon.com are unnamed co-conspirators in acts and conduct

complained of herein because they act together with Amazon Services LLC in stifling

competition in the Marketplace, as described herein throughout.  It is this open and

notorious, concerted, anticompetitive conduct that prompted Venture capitalist Chamath

---

[23] ' . . . shut out of competition for anticompetitive reasons, is indeed among those the antitrust
laws were designed to prevent." In *Brader v. Allegheny General Hospital*, 64 F.3d 869 (3d Cir.
1995)
[24] This section of the Complaint is supported by seller forum remarks at
https://sellercentral.amazon.com/forums/thread.jspa?messageID=2783317

Palihapitiya to opine: ""We believe there is a multitrillion-dollar monopoly hiding in plain sight,"[25]

48.  Amazon thus has market power in the retail sales platform services market, through which retail sales of goods and services must move en route to the consumer.  The Antitrust Laws were created in part to address precisely this circumstance vis-à-vis the devastating effect of railroads on competition in the 19th Century.

## AMAZON AND MARKETPLACE SELLERS

49.  Pursuant to BSA, third-party sellers provide content for product offerings, and are responsible for ensuring that the provided content and products are lawful.[26]

50.  When a third-party seller wants to offer a product for sale on amazon.com, the seller must first determine whether the product already exists in the amazon.com catalog. (ASIN Creation Policy).[27]  Multiple sellers can offer the same product for sale. If the same product already exists in the catalog, the seller can add specific details – including price and product condition and any additional product details – and their offering is listed, along with other sellers of the same product, on the same product detail page.

51.  If the product is not already in the catalog, a third-party seller can create a new product listing. To do so, the seller must send Amazon, via an automated file upload system, content related to the new product, including the product description, an image of the product, and the product's price.

---

[25] https://www.wired.com/story/amazon-whole-foods-monopoly-antitrust/

[26] Many of the factual allegations in ¶¶49-54 of the Complaint are substantially quoted from a Declaration of Jonathan Schelle in Support of Motion for Summary Judgment, submitted by *Amazon in Lasoff v. Amazon.Com, Inc*., No. 2:16-cv-00151-BJR (W.D. WA  12/5/16), Docket No. 50.

[27] Each unique product offered for sale on amazon.com is assigned an Amazon Standard Identification Number ("ASIN").

52. This seller-supplied content is then used to automatically generate a "product detail page."[28] The third-party seller is responsible for the uploaded content, and specifically represents and warrants that it has the right to grant Amazon a license to use all seller-provided content, trademarks, and other materials.

53. Amazon represents that its role with respect to seller-submitted content and product offerings is limited and passive.  Amazon represents that it does not suggest prices for third-party offerings, or generally involve itself in third-party sales except to set parameters on terms and conditions of use.  Those parameters include a third-party seller's agreement to be bound by Amazon's policies, including acknowledgment that "[p]roducts offered for sale on Amazon.com must comply with all laws and regulations and with Amazon's policies."  Under Amazon's Intellectual Property Violations Policy, third-party sellers are responsible for ensuring that the products they offer for sale are legal. ("Sellers are responsible for ensuring that the products they offer are legal and authorized for sale or re-sale."). All products offered by third-party sellers are owned by the third-party sellers, not Amazon.

54. Amazon's policies explain that sellers may list their products for sale against pages that another seller has created with one proviso, namely, that they are selling the same product:

> **Detail Page Ownership and Image Restrictions:** When a detail page is created, it becomes a permanent catalog page on Amazon.com that will remain even if the creator's inventory sells out. Additionally, when you add your copyrighted image to a detail page, you grant Amazon and its affiliates a nonexclusive, worldwide, royalty-free, perpetual, irrevocable right to exercise all rights of publicity over the material.

---

[28] A "product detail page" is a webpage that displays the product offering in the amazon.com marketplace, including the product name, photos, and description.  *Id.* ¶ 9

> Other sellers can list their items for sale against pages that you
> have created or added your copyrighted images to. However, we
> do require sellers to list only against detail pages that exactly
> match their items. If you believe sellers are listing against detail
> pages that do not exactly match their items, we ask that you report
> the violation directly by using the contact us form.

55. Allowing all sellers to list the same product on the same page generates intense price competition that is highly beneficial to consumers, who understand that Amazon presents the Marketplace's entire array of a given ASIN on the same product detail page. Eliminating low-priced competitors is injurious to competition and to consumers. Many or most online buyers view Amazon as one-stop shopping and look no further. Such consumer behavior is fundamental to Amazon's business plan.

56. Amazon's policies expressly prohibit third-party sellers from violating the intellectual property rights of others. If a product listing is determined to be counterfeit, expired, defective or otherwise inferior to the ASIN, to be in violation of third-party intellectual property rights, or to otherwise violate Amazon's policies, Amazon *may* block the listing or, in certain circumstances, terminate the third-party seller. Before it can act, Amazon must, according to its own written policies, determine whether the reported item or items do actually infringe on another seller's rights. To do so, Amazon represents to the public that it conducts an investigation, typically by asking the reporter of the alleged infringement to establish their intellectual property rights, to conduct test purchases of the allegedly infringing products, and to provide Amazon with material differences between the reporter's product(s) and the alleged infringer's product(s). Amazon publically holds out that it requires evidence of infringement for each product that it is asked to take down, as it cannot assume that because one product is infringing, all of that seller's products are infringing. Part of the basis of this litigation is Amazon's disregard of the foregoing

procedures and protocols it publically holds out as applicable to claims of product counterfeiting, thereby allowing Amazon to accomplish a purpose of limiting price competition regardless of product authenticity.

57. Amazon knows that many or most of the infringement complaints it receives from complaining sellers are falsely premised upon the notion that grey market goods may not be sold using intellectual property belonging to a remote manufacturer or other Producer. Nevertheless, Amazon uses such ill-conceived infringement complaints in concert with hundreds of complainants, *pretextually*, to stifle Marketplace competition.  The protocol is routine, institutionalized and at times lethal to competition and potential competition.

58. Selectively and for reasons known only to Amazon, Amazon not infrequently does *not* object—despite the vehement pleas and objections of rightholders—when it *should* object to wrongful use of the Marketplace, i.e. to the patently *unlawful* use, e.g. damaged, expired, counterfeit merchandise—which does occur-- by third-party sellers of trademarked and copyrighted goods.  Frequently, as with Snuggie blankets for which suit was brought against Amazon on May 3, 2017, Amazon disregards rightholders' legitimate complaints of infringement.[29]

59. The Sherman Act proscribes the arbitrary, result-driven, and ill-conceived discipline imposed by Amazon on the relevant market.

---

[29] http://www.businessinsider.com/the-maker-of-the-snuggie-blanket-is-suing-amazon-2016-12. For one of the most compelling accounts of Amazon's (for want of better language) ruthlessness, i.e. the "context" in which this matter arises, the Court is directed to the account of an American small business (and its family-owners) being destroyed by permitted wrongdoing from Dubai. See https://sellercentral.amazon.com/forums/thread.jspa?threadID=356384&ref_=_sf_356384_wsfqs_home&sortBy=helpful

**AMAZON VIOLATES ITS OWN WRITTEN POLICIES**

60.    Amazon selectively discriminates, in concert with favored sellers and brands, and against

unfavored third-party sellers, of identical ASIN'S, by restricting third-party seller offerings,

excluding competitors in the relevant market, and stifling price competition.  Specifically,

Amazon selectively and routinely does the following:

    a.    In contrast to Amazon's published policies quoted above, Amazon does not permit sellers to list certain of their items for sale against pages created or added by other sellers with copyrighted images.

    b.    In contrast to Amazon's published policies quoted above, Amazon regularly prevents sellers from listing products that are not counterfeit, do not violate anyone's intellectual property rights, and do not violate any Amazon policy.

    c.    In contrast to Amazon's published policies quoted above, Amazon takes action to delist (or preclude listing) disfavored sellers' products without determining whether a reportedly infringing item or items do actually infringe on another seller's or Producer's rights.

    d.    In contrast to Amazon's published policies quoted above, Amazon takes action to delist (or preclude listing) disfavored sellers' products without Amazon conducting an investigation, i.e without asking the reporter of the alleged infringement to establish its intellectual property rights, to conduct test purchases of the allegedly-infringing products, or to provide Amazon with material differences between the reporter's product(s) and the alleged infringer's product(s).

    e.    In contrast to Amazon's published policies quoted above, Amazon takes action to delist (or preclude listing) disfavored sellers' products without requiring evidence of infringement for each product that it is asked to take down.

**AMAZON:  THE PLATFORM CONTEXT**

61.    Industry leaders have called Amazon a "monopoly hiding in plain sight," the tentacles of

which spread nationwide, horizontally and vertically, across multiple industries:[30]

> Amazon is the titan of twenty-first century commerce. In addition to being a retailer, it is now a marketing platform, a delivery and logistics network, a payment service, a credit lender, an auction house, a major book publisher, a producer of television and films, a fashion designer, a hardware manufacturer, and a leading host of cloud server space . . . the company has positioned itself at the

---

[30] "We believe there is a multi-trillion dollar monopoly hiding in plain sight."  A. Gara, *Why One Amazon Bull Thinks Jeff Bezos Is Building A $3 Trillion Company*, Forbes (May 4, 2016), reprinted

center of e-commerce and now serves as **essential infrastructure** for a host of other businesses that depend upon it.  (bold added)

62.    Amazon's position as "essential infrastructure" is evidenced by:

a.    Third-party seller dependence on the Marketplace for survival as a business,[31] to the extent that Amazon can raise non-transitory prices for access to and use of its online facility without suffering offseting revenue losses or the entry of rival platforms;

b.    Market Power, with a dominant 48% of total online retail sales nationwide;

c.    Dominance of up to 75% market share in selected niche sub-markets, e.g. e-book and e-reader markets where Amazon has crushed all viable competition aside from Apple;[32]  Such dominance has been characterized by declining incomes for full-time and part-time writers within Amazon's reach.[33]

d.     The fact that a high percentage of online shoppers visit the Amazon Marketplace—as opposed to a third-party search engine--as their first shopping stop on the web;

e.    Less than 1% of Amazon's 65 to 80 million Prime members are likely to consider visiting competitor retail sites once having landed on Amazon.[34]

f.    Vertically-integrated Fulfillment-by-Amazon, wildly popular with sellers, permits Amazon to *use* its delivery and logistics services to discriminate amongst competitors and promote/retard sales at will; and

g.     Existence of high, virtually insurmountable entry barriers to establish a competitive marketplace precludes any foreseeable challenge to Amazon's market dominance as a platform-based marketplace for third-party sellers.

---

at https://www.forbes.com/sites/antoinegara/2016/05/04/why-one-amazon-bull-thinks-jeff-bezos-can-build-a-3-trillion-company/#5d2763bf5d27

[31] See Angus Loten & Adam Janofsky, Sellers Need Amazon, but at What Cost?, Wall St. J. (Jan. 14, 2015, 6:30 PM), https://www.wsj.com/articles/sellers-need-amazon-but-at-what-cost-1421278220 ("If you say no to Amazon, you're closing the door on tons of sales.").

[32] Amazon's takeover of the book industry, known as the "Gazelle Project," generated interesting anecdotes, as when CEO Jeff Bezos suggested "that Amazon should approach these small publishers the way a cheetah would pursue a sickly gazelle."  One target, a Brooklyn publishing house, described meetings with Amazon as "like dinner with the Godfather."  Amazon demanded tribute and CEO Johnson would later relate:  "I paid that bribe . . . and the books reappeared."  See http://www.joestracci.net/blog/2014/3/19/i-paid-that-bribe-helping-amazon-to-make-my-life-worse

[33] "Indeed, writng-related income of full-time book authors, the Authors Guild found, dropped 30 percent from $25,000 in 2009 to $17,500 in 2015. Part-time authors saw their writing income decline 38 percent from $7,250 to $4,500." https://www.law.ox.ac.uk/business-law-blog/blog/2017/04/e-scraper-and-e-monopsony

[34] Analysts have opined that half of America's household will have Prime by 2020. Dan Frommer, Half of US Households Could Have Amazon Prime by 2020, Quartz (Feb. 26, 2015), http://qz.com/351726/half-of-us-households-could-have-amazon-prime-by-2020 [http://perma.cc/ZW4Z-47UY].

63.   The online e-commerce platform milieu tends toward high concentration levels.  See ¶1

*supra.*  Among online *auction* platforms, for example, *eBay* has enjoyed very high market

shares almost from the beginning of electronic commerce, ultimately reaching

approximately 99% in 2008.[35]  The Motley Fool chart in ¶70 below shows that for the last

10 years in the United States Amazon has dominated all marginal growth in the online

platform market for retail sales.

**RELEVANT MARKET/MARKET POWER: ONLINE RETAIL SALES**

64.   The relevant market of online retail sales (and narrower relevant markets contained therein)

is recognized universally as a discrete area of competition, with no rivals to Amazon.[36]

Those who study Amazon have no doubt but that Amazon has market power in the relevant

market as of June 20, 2017:

> Most of the antitrust concern will come with the exceptional market power that
> Amazon wields *online,* combined with the under-appreciated conflict in its
> business model where half of its retail revenues come directly from consumer-
> customers, and the other half come from its MarketPlace offering where Amazon
> is the mall and gatekeeper . . . .[37]

> Its 80 million Prime members represent 63% of all U.S. households, and nearly
> the whole upper-end of the market. In short, Prime has given Amazon monopoly
> power in online shopping, and its retail customers are satisfied.

> Its Marketplace customers [i.e. sellers], however, are not all satisfied. They will
> be less satisfied with the Whole Foods deal, and they have a lot of insight into

---

[35] J. Haucup & U. Heimishoff, Google, Facebook, Amazon, eBay: Is the Internet Driving
Competition or Market Monopolization?  at p. 7, reprinted at
https://pdfs.semanticscholar.org/40bc/5747d11009f065d76d56da2f50dcf700c728.pdf
[36] https://www.fool.com/investing/2016/09/26/how-amazon-is-crushing-ebay-and-wal-mart.aspx
[37] https://www.thestreet.com/story/14187838/2/fed-scrutiny-of-amazon-whole-foods-likely-to-
focus-on-wholesaling.html at page 2.

how Amazon operates to steer business away from them and toward its own products.[38]

65. An analysis by Slice Intelligence recently released found that 43% of all online retail sales in the US went through Amazon in 2016, as the e-commerce giant's market share continues to grow.  According to the study, which analyzed more than 4 million online purchases, Amazon accounted for the majority (53%) of the growth in US e-commerce sales for the year.  "Amazon accounts for 43% of US online retail sales:" BI Intelligence 2/3/17, at http://www.businessinsider.com/amazon-accounts-for-43-of-us-online-retail-sales-2017-2

66. Amazon now controls 46% of all e-commerce in the United States, capturing nearly $1 of every $2 Americans spend shopping online.

67. The practical barriers to successful and sustained entry as an online platform are very high, given the huge first-mover advantages stemming from data collection and network effects.

68. The source of Amazon's power is: (1) its dominance as a platform effectively necessitates that independent merchants use its site; (2) its vertical integration—namely, the fact that it simultaneously sells goods as a retailer and hosts sales by others on its Marketplace; and (3) its unprecedented ability to amass data of all kinds by virtue of being an intermediary internet company. It is this last factor—data operations—that exacerbates the anticompetitive potential of the first two.[39]

---

[38] https://finance.yahoo.com/news/amazon-com-inc-amzn-whole-145144667.html

[39] Much of this section of the Complaint relies on L. Kahn, Amazon's Antitrust Paradox, 126 Yale L. J.___ (January 31, 2017), reprinted at http://www.yalelawjournal.org/note/amazons-antitrust-paradox.  Ms. Kahan's thesis that Amazon's data harvesting is a critical factor in relevant market analysis is shared by a. Esrachi & M. Stucke, The E-Scraper and E-Monopsony (April 10, 2017), at https://www.law.ox.ac.uk/business-law-blog/blog/2017/04/e-scraper-and-e-monopsony

69.  The economics of platform markets create incentives for Amazon to pursue growth over profits because investors have rewarded that strategy. Under these conditions, predatory pricing becomes highly rational for platform hosts at a time when brick and mortar stores are shutting down and legendary firms are bankrupt.[40]

70.  Amazon has crushed its competition for platform-based online retail sales over the last 10 years.   The following chart compares Amazon versus its primary competitors, to wit, as eBay and Wal-Mart, in terms of stock price performance and revenue growth over the past decade. The image is quite clear: Amazon has obliterated both eBay and Wal-Mart over this period.



---

[40] M. Perry: Creative destruction: "Thousands of traditional retailers close as consumers switch to online retailers like Amazon," March 30, 2017, at https://www.aei.org/publication/creative-destruction-thousands-of-traditional-retailers-close-as-consumers-switch-to-online-retailers-like-amazon/

It is therefore unremarkable that Amazon controls at least 46% of all retail sales in ecommerce.

71.    The relevant market is determined in part by these economic realities:



a.  Online retail-sales *platforms* constitute a discrete, nationwide "two-sided" intermediary market, over which Amazon has market power, where constraints operate simultaneously at Amazon's direction toward both sides of the market--buyers and sellers with Amazon in the middle--whereas traditional brick and mortar stores and most online sellers function in an unleveraged one-sided market.[41]

b.  Amazon has few if any platform competitors that third-party sellers might switch to if Amazon's Marketplace-access fees rise; and there are no alternate sales platforms that such competitors could substitute to if  Amazon were to withdraw its Marketplace accessibility to them entirely.  Due to Amazon's market power as an essential facility in the relevant market, seller-competitors have no practical alternative to selling on Amazon's platform.  See n. 31, *supra* and accompanying text.

---

[41] A shopping center is an example of a two-side market; however, such is not comparable to online platforms because cost structures seriously limit public exposure and sales capacity.  Not so on internet platforms.

c. Retail sales platforms, dominated by Amazon, leverage vertically-integrated products and services such that brick and mortar stores and even major technology firms cannot effectively compete with Amazon, as evidenced by the antitrust conspiracy of 6 book publishers and Apple against Amazon. See n.32 *supra* and accompanying text.

d. Online platform shoppers experience "network effects" unavailable in brick and mortar stores, such as customer reviews affording independent discussion of potential purchases;

e. Brick-and-mortar stores are generally only able to collect information on actual sales, whereas Amazon tracks what shoppers are searching for but cannot find, as well as which products they repeatedly return to, what they keep in their shopping basket, and what their mouse hovers over on the screen.  Such data permits a highly tailored shopping experience;

## AMAZON'S THIRD PARTY SELLERS

72.   Amazon has some two million third-party sellers worldwide, most of whom list only a few products.

73.   Many thousands of Amazon's third-party sellers in the United States are businesses, such as Plaintiff herein, in the sense that they generate enough income to support at least one person.

74.   These business people, often referred to as Professional Sellers,[42] typically rely entirely or substantially entirely on Amazon to support themselves and their families.[43]

75.   Many of these Professional Sellers are known as Retail Arbitragers, meaning people who look for deals for what is known as "grey market goods", e.g. deeply discounted goods at

---

[42] Professional Sellers "list more than few handfuls of products, and expect to be regular sellers into the future."  "Individual Sellers . . . are typically sellers that have a small supply of product that they want to sell and then be done with selling – something like a college student wanting to sell some used textbooks at the end of term."  *Create an Amazon Seller Central Account,* at http://www.buyboxexperts.com/create-an-amazon-seller-central-account/

[43]  "This is not a part time gig for me to make some pocket money, this is our career, our livelihood and how we make a living, as well as our employees. There is no one to call, no one to explain to us why they are doing this."
https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0;  see also
http://www.practicalecommerce.com/The-Anatomy-of-an-Amazon-Legal-Dispute

Walmart or Staples, liquidations and other deal sources.  They will then list such goods for sale on the Amazon Marketplace in original, sealed packaging.

76.  Success depends significantly on the use of software that adjusts product prices as frequently as every few minutes, the objective of which is to undercut other sellers and thereby win the "Buy Box," the Marketplace's default seller on the product page for the particular ASIN.

77.  A sizeable share of these Professional Sellers is based overseas, using Amazon's Marketplace, FBA and logistics to get products to American doorsteps.

78.  As Amazon has grown in presence and power over the years, manufacturers, their authorized distributors and brands, sometimes called First-Party Sellers  (collectively "Producers") have reluctantly flocked to Amazon, knowing Amazon is an essential infrastructure.  In addition to Arbitragers and Producers, Independent Retailers have also found it necessary to list on Amazon, understanding that Amazon is America's default marketplace for everything.

79.  Amazon enters into contracts with Producers and third-party sellers, and encourages them to report suspected violations of Amazon's rules and policies.  Amazon retains the right "to make judgments in its sole discretion" about whether to suspend or terminate any seller's account for any reason.  The abuse of  "reporting" protocols for anticompetitive purposes is one of the concerted behaviors at the root of this litigation.

**THIRD-PARTY SELLERS' LISTING AND SALE OF GREY MARKET GOODS**

80.  The grey market, also referred to as the parallel market, is a market where a product is bought and sold outside of the manufacturer's authorized trading channels, for example, an

Arbitrager's Marketplace re-sale of a GE toaster oven acquired from Costco at a deep discount.

81. Arbitragers' typically purchase goods, e.g. deeply discounted at Nike, Walmart, Alibaba, Staples or a Going Out of Business Sale, only to resell them on the Marketplace for a profit.  Arbitragers may undercut other Sellers, including those who have intellectual property rights embedded in grey market products being marketed.  Producers and their "authorized dealers," in particular, are thus incentivized to eliminate undercutting Arbitragers, both to retain value perceptions in the public marketplace for "their" products and, more immediately, protect profit margins on the Marketplace.

82. As stated in Amazon's policies quoted above, it is completely lawful for third-party sellers to purchase grey market goods and sell them on Amazon.  Indeed, such products are by design placed on the same product detail page often created by a trademark holder, copyright holder, or affiliate.  Amazon's established policy is that such products may be offered alongside a rightholder's offering—indeed, such goods may create the catalogue page-- as long as the third party seller's offering is "the same product" as described in by brand, name, ASIN, etc.

83. Well-established doctrines make clear that trademark and copyright laws do not prevent the purchasers of trademarked or copyrighted items from re-selling them without permission from the owner of the trademark or copyright.  The First Sale Doctrine permits one who has acquired ownership of a copy to dispose of that copy without the permission of the copyright owner.17 U.S.C. § 109   The Fair Use Doctrine permits a defendant to use a plaintiff's trademark to identify plaintiff's goods so long as no likelihood of confusion results as to the source of the product or the trademark holder's sponsorship or affiliation

(e.g. "authorized dealer").  15 U.S.C. §115(b)(5)(A)-(C). The first sale doctrine [also]

protects resellers of genuine trademarked goods from claims of infringement. *Davidoff &*

*CIE, S.A. v. PLD Int'l. Corp.,* 263 F.3d 1297, 1301 (11th Cir. 2001); *Hidalgo Corp. v. J.*

*Kugel Designs, Inc*., No. 05-20476-CIV-JORDAN/TORRES, 2006 U.S. Dist. LEXIS

96647, at *12 (S.D. Fla. 2006)

84.    The Marketplace is thus routinely presented with multiple sellers of the same product on

the same page, as specifically provided in the BSA and Amazon formal policies.  See

Detail Page Ownership and Image Restrictions, quoted *supra* at p.1.

## CONCERTED ACTIONS OF AMAZON AND RIGHTHOLDERS HARM COMPETITION AND DAMAGE COMPETITORS[44]

85.    Trademark and copyright owners often seek to eliminate competitive grey market products

listed for sale on the Marketplace.  Because the grey-market seller's products are lawful,

*rightholders are powerless to stop unwanted Marketplace competition unless Amazon*

*supports their position with concerted actions*.  "Rightholders," who are often imposters to

begin with, i.e. looking for a way to suppress competition for ASIN's in which they have

invested, send so-called "takedown notices" to third party sellers, demanding a de-listing of

one or more products by the third-party seller, failing which the rightholder usually

threatens to complain to Amazon with allegations of violations of intellectual property

rights and/or sales of counterfeit goods.  Rightholders' threats of marketplace exclusion

have often been realized with a single, unexpected yet catastrophic, email from Amazon

Performance to the accused third-party seller.  At least 61% of Amazon's third-party sellers

---

[44] "Some of them may be restricted per a request from the manufacturer, who wants to keep the market on its product. Amazon tends to accede to requests like those, no matter what it does to those sellers who want to offer items at lower prices."
https://sellercentral.amazon.com/forums/thread.jspa?threadID=175278

fear being banned.  http://www.webretailer.com/lean-commerce/amazon-sellers-survey-2016/

86.   The complaining seller's takedown notice and Amazon's response thereto is often a sham, a pretext to rid the market of unwanted competition.  Such a sham cannot shield the acts and practices now challenged from scrutiny and sanction if warranted.  Amazon's right to terminate a competitor "at will" cannot overcome its accountability for conduct in violation of the Sherman Act, §1, i.e. wholly contrary to public policy.  See n. 6 *supra.*

87.   In 2013, for example, Apple complained to Amazon of rights violations (counterfeit product sales) vis-a-vis a price-cutting third party seller of certain iPod covers.  Amazon immediately delisted the subject products.  Ultimately Apple *admitted* that the purported seller's "aggressive price point" was the reason behind its complaint.  Amazon ultimately justified the seller's termination on unrelated facts, irrespective of the seller's innocence of Apple's initial, erroneous claims of counterfeit products.   The seller lost sales of $180,000 per month.[45] This is the paradigm by which Amazon implements the de-listing prong of its challenged, anticompetitive conduct.

88.   Communications between rightholders and sellers are accomplished, exclusively, through Amazon's proprietary communications networks which employ coded email addresses and seller screen names.  Amazon's networks assure that Amazon can monitor all communications while Sellers and rightholders do not have access, normally, to the accused seller's email address outside the Amazon network.  But for Amazon's proprietary networks and encouragement of baseless infringement claims, rightholders would be unable to send takedown notices to sellers.

---

[45] https://www.cnet.com/news/amazon-seller-sues-amazon-apple-over-deleted-listings/

89.   Amazon's official policy is that it will not enforce an exclusive online market for

rightholders even where a accused seller is in breach of an exclusive distribution

agreement:

> Amazon respect a manufacturer's right to enter into exclusive distribution
> agreements for its products. However, violations of such agreements do not
> constitute intellectual property rights infringement. As the enforcement of
> these agreements is a matter between the manufacturer and the retailers, it
> would not be appropriate for Amazon to assist in enforcement activities.

Notwithstanding its clear commitment to refrain from excluding "non-authorized sellers,

Amazon does exactly that, albeit selectively, to wit: Amazon allows rightholders to register

their intellectual property rights with Amazon and, though a subsequent process known as

"gating," may restrict all "non-approved" sellers from listing products on Amazon.  In

essence, Amazon extends the private monopoly of rightholders vis-à-vis

trademark/copyright at the expense of third-party sellers, contrary to the First Sale and Fair

Use Doctrines.  Amazon does not ordinarily restrict brands except in concert with the brand

itself.

90.  Rightholders numbering in the hundreds have thereby advantaged themselves and their

favored sellers against unwanted platform competition.  This fact, known to Amazon,

bespeaks a conscious commitment to a common scheme designed to achieve an unlawful

objective on the part of Amazon and favored sellers.  Amazon, of course, is typically

motivated to combine with rightholders because such rightholders pay fees to Amazon to

utilize the online Marketplace as a protected environment in which to sell their wares in

heavy volumes with protected price points; or, as in several documented cases chronicled

herein, Amazon trades protection from price competition for most favored buyer status vis-

à-vis the branded products at issue. This misuse of intellectual property rights to lessen

competition in the relevant market is a violation of the Antitrust Laws. See note 6, *supra*.

91.  "Amazon has long had a brand registry, where brand owners could go through a process to

register a brand/product as theirs and say they didn't want others to sell it."[46]

92.  Amazon has standing agreements and understandings with hundreds of rightholders (and

their affiliates/contracting parties) to restrict listings of third party sellers on the

Marketplace,[47] with an intention and effect of limiting competition and protecting supra-

competitive pricing,[48] *inter alia,* as to entire brands and individual ASIN's. The restricted

products are referred to as "gated."[49] Amazon initiated "gating" no later than 2012-2013.[50]

Gating on individual ASIN's creates product monopolies "in plain view" and has

---

[46] https://thesellingfamily.com/amazon-restricts-popular-brands-amazon-sellers/

[47] "This is my thoughts, this is not amazon shut everything down. This is brands issue. Lots of them report property rights and get agreement with amazon to shut 3p sellers down. I think Jeff smart enough. He lets Chinese sellers get in just to keep market going. But same time he does not need any issues with USA brand companies. So you really think he will shut 3p sellers down for no reason and lose money? What he makes call a habit and hard to get rid of it, that's why amazon don't care about Chinese, Jeff still wants his money does not matter how." https://sellercentral.amazon.com/forums/thread.jspa?threadID=302307&start=75&tstart=0&sortBy=datec

[48] There's one out of print one I saw a few weeks ago (a dvd from Universal) that had like 15 sellers on it, starting at $20 new. I looked at it a few days later, suddenly restricted with only 4 sellers new, starting at $90.
https://sellercentral.amazon.com/forums/thread.jspa?threadID=165203

[49] "Please note it is the Manufacturer who has placed the restriction and instructed Amazon to gate this Brand for third party sellers.
We apologize for the inconvenience caused to you due to this matter.
Seller Support is not authorised to ungate the items."
https://sellercentral.amazon.com/forums/message.jspa?messageID=3841266

[50] "Amazon is beginning to allow manufacturers to "gate" or restrict new listings of their branded products. If this brand is gated, then you will need a letter from the manufacturer allowing you to sell as NEW."  https://sellercentral.amazon.com/forums/message.jspa?messageID=3849997
(Registered: 12 Dec, 13 10:45 PM)

accelerated in recent months to the point of harming and threatening the extinction of many

Professional Sellers.  See n. 43 *supra.*

93.    Amazon does not officially publish a list of its restricted brands, ASIN's and products.

although market watchers have published such lists on a rolling basis.  E.g., "The Known

Brands That Are Not Allowed To Be Sold By Amazon Third Party Sellers,"

https://thesellingfamily.com/the-known-brands-that-are-not-allowed-to-be-sold-by-

amazon-third-party-sellers/

94.    At the time of listing to a product detail page, however, a seller may get an "error message"

instructing that the proposed product, not known to be on a restricted list, may not be listed,

or listed only as "used."[51]  As documented from the J&J episode, see ¶103 *infra,* such

restriction may be Amazon's unilateral action (presumably lawful) or concerted actions of

Amazon and rightholders intended to exclude competitors (*prima facie* unlawful).  Amazon

is not generally (if ever) an exclusive distributor of any of the gated products, but rather, a

horizontal competitor or such competitor's enabling co-conspirator.

95.    Amazon often ignores strong evidence of seller innocence, remains consciously ignorant

thereof, and forbids listings on pretexts that leave its sellers clueless.[52] Seller after seller

---

[51] "It's always a good idea to have the Amazon Seller app downloaded on your phone so you can check if a product is restricted when you are out sourcing for items. When you scan an item, it will indicate whether you can sell the item, and if so, in what conditions you can sell it." http://selleressentials.com/amazon-restricted-brands/

[52]  We've been selling on Amazon for 3-4ish years, sold around 3600 items. 99% positive feedback, all metrics good. Trying to be able to sell some products that are shown as restricted, items we won from a wholesale auction. (B-Stock supply sourcing network) Unfortunately, Amazon denied the request, after asking 3-4 times for invoices, and we provided them. They never said what they expected to be on the invoices, but we gave the invoices that we received from our purchase from the source.
https://sellercentral.amazon.com/forums/message.jspa?messageID=3558001

attests that when a Kitchen Aid, NFL or any of dozens of sellers/suppliers demand

Amazon's protection from grey market goods, no amount of product authentication against

Amazon's purported fears of counterfeiting suffices.[53]

96.    Another ruse for eliminating competition is a rightholder's claim that MAP pricing must be

observed by unrelated third-party sellers with no contractual relationship to observe MAP.

It is well known that Amazon frequently disciplines such price competition with Draconian

measures:

> In the event a manufacturer encounters a non-responsive or repeat violator, they
> should (or threaten to) proceed with contacting Amazon.
> Ultimately, continued violators will receive legal notices based on copyright
> infringement and have their selling privileges revoked.[54]

97.    In many cases the seller affects the listing without notice of restriction, only later to be

challenged by a rightholder (or an imposter). If the seller remains listed on the product

---

"Most Amazon sellers are not aware that the business they build over many years is always at the
mercy of the Amazon gods. It's like Russian roulette. There is always a risk that you will get
your account suspended without any reason.  . . . There are no fair and balanced appeal processes
in place. Amazon is run like a totalitarian state. Sellers on Amazon have no rights whatsoever.
Selling online without having a presents at the Amazon Market place got very difficult."
http://www.amazonsuspension.com/how-amazon-almost-destroyed-my-life/

Amazon will usually find an alternative way to accuse you of breaking the rules if you are selling
a product that they don't want you to be selling. There is nothing you can do about it and its just
one of the perks of selling on amazon. Do as amazon says even if it makes zero sense.
If you can get a manufacturer invoice then you might be able to get the listing back, but since
you are the manufacturer then chances are they are not going to accept an invoice made by
you. If you question it further they might remove your selling privileges altogether."
https://sellercentral.amazon.com/forums/thread.jspa?messageID=3836419

[53]"We have cancelled your offers listed at the end of this message and are conducting a review of
your selling account because there's a concern about the authenticity of these
items" https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0
[54] T. Johnson, Minimum Advertised Price (MAP) Violations & Policing Your Brand on Amazon,
athttp://www.cpcstrategy.com/blog/2015/05/minimum-advertised-price-map-violation-amazon/

detail page in defiance of a rightholder's challenge, and the rightholder complains to Amazon, Amazon may or may not—but often does—issue a warning or suspension to the third party seller.[55]   There is no known process associated with Amazon's decision-making as to the alleged infringement.

98.   Brand protection from "unauthorized sellers" can be and is accomplished through restriction and gating *ab initio*.[56]   Unrestricted brands that demand a takedown *ad hoc* upon grounds of counterfeiting/intellectual property violations do so frequently to eliminate price competition and for no other reason.   See note 45 *supra*.

99.   One of Amazon's boilerplate warnings to third-party sellers is indifferent to seller fault and invites, at minimum, a compromise of perfectly legitimate third-party sellers by rightholders or imposters of rightholders:

> We are contacting you because we received a report of trademark infringement from the rightholder listed below. Sellers on Amazon.com are not allowed to create listings or detail pages that infringe trademark rights.  We removed the content listed at the end of this email. We may let you list this content again if we receive a retraction from the rightholder.
>
> . . . .
>
> Sincerely,
>
> Seller Performance Team
> Amazon.com
> http://www.amazon.com

---

[55]"My company can't help but feel as though Amazons own systems/algorithms have been taken advantage of by some unscrupulous seller. We are struggling to understand how these claims get through the system without being verified for authenticity. This could have been accomplished by simply vetting their supposed emails addresses."
https://sellercentral.amazon.com/forums/message.jspa?messageID=3836482
[56] This item is not on the restricted items list yet it is being treated as one.
https://sellercentral.amazon.com/forums/thread.jspa?threadID=319965&tstart=0

100. The United States Patent and Trademark Office ("USPTO") defined the amorphous term
     Trademark Bullying or Trademark Trolling as the vexatious practice of a trademark owner
     that uses its trademark rights to harass and intimidate another business beyond what the law
     might be reasonably interpreted to allow.  In many or most of the instances that Amazon
     issues its boilerplate trademark infringement removal/warning, Amazon has no reasonable
     basis for concluding that an infringement has occurred; rather, Amazon knows or should
     know that Trademark Bullying is likely afoot!   Amazon's concerted behavior at the behest
     of and in concert with rightholders is often for anticompetitive purposes, such as
     suppressing price competition.  See Report to congress, reprinted at
     https://www.uspto.gov/ip/TMLitigationReport_final_2011April27.pdf

101. And finally, Amazon may at times, *claiming falsely* to have received a complaint, issues a
     warning with no previous takedown notice to the third-party seller. . . for reasons known
     only to Amazon.[57]  The fact and frequency of such conduct is evidence of Amazon's intent
     to eliminate competition upon pretext, whether the conspiracy's beneficiary is viewed as
     Amazon itself or a co-conspirator whose favor is more valuable to Amazon than that of the
     small business accused of wrongdoing.

---

[57] "We've been denied the ability to sell a couple of brands that never requested gating for their
products, even with a signed authorization letter from the brand owner that gave us blanket
permission to sell their products on Amazon. Each time Amazon has sent back letters saying
something to the effect of "sorry, but you can't be approved to sell this brand and we can't tell
you why because our decision making criteria are proprietary."
https://sellercentral.amazon.com/forums/message.jspa?messageID=3849997

102. The "twilight zone" for third party sellers on Amazon was expressed by one Andy Ayers as follows:[58]

> For example, seller Andy Ayers told Bloomberg he projected selling $500,000 worth of products on Amazon this year—until his account was suspended. 'I wasn't doing anything shady,' he said. 'It seems there are a lot of Amazon sellers who aren't doing anything wrong and are getting punished. There's an arbitrary nature to it.'

**ADDITIONAL DOCUMENTED MISCONDUCT SUPPORTING COMPLAINT PLAUSABILITY**

**A.  Johnson & Johnson**

103. In a highly publicized matter where Amazon *refused* to restrict product listings, Johnson & Johnson sought Amazon's assistance in protecting its brand from third-party Marketplace sales of damaged, discontinued, expired or soon-to-be-expired products. Logically, such sales with J&J logo, etc. would damage J&J's image and hence infringe its intellectual property rights.  In fact, many consumers had written negative reviews.  As mentioned n.65 vis-a-vis  Snuggie Blankets, however, Amazon rejected J&J's proof and refused to intervene with the unethical third-party sellers, some suspect, as "pay back" because J&J's own website directed consumers to drugstore.com (and not to Amazon) as a source of certain J&J over-the-counter remedies such as Tylenol, Zyrtec and Benadryl.  See S. Ng & J. Rockoff, Amazon and J&J Clash Over Third-Party Sales, https://www.wsj.com/articles/amazon-and-jampj-clash-over-thirdparty-sales-1384132041.

---

[58] S. Shayon, Amazon Gets Tough With Third-Party Sellers of 'Restricted' Brands, printed at http://www.brandchannel.com/2016/08/29/amazon-brands-082916/

### B.  Birkenstock

104. In reality Amazon is not arbitrary, but most calculated, as Birkenstock USA, the footwear manufacturer learned.  Like many manufacturers, Birkenstock sells its most popular shoes through every channel, including mass retailers like Amazon, while it reserves part of its line, typically new and niche designs, for rollout in brick-and-mortar stores with enhanced promotion and customer service. Amazon wanted Birkenstock's entire line in its Marketplace, but Birkenstock refused.

105. Birkenstock sought to ban certain sellers of fake Birkenstock product on amazon.com, and proved that the Marketplace was beset by counterfeits of its product line.  David Kahan, CEO of Birkenstock USA, wrote in a letter to the company's retail partners that in three years of discussions with Amazon's management, he "presented multiple proposals and 'out-of-the-box' ideas" to address the problem. But Amazon declined to act. "Amazon made it clear that the only way to achieve a 'clean' environment (no counterfeits and no unauthorized [meaning grey-market]sellers)," Kahan reported, "is to sell complete product offering to Amazon directly."  Reprinted at http://www.cnbc.com/2016/07/20/birkenstock-quits-amazon-in-us-after-counterfeit-surge.html

106. The Birkenstock episode suggests why Amazon often chooses, in concert with favored competitors, to ban perfectly legal grey-market product sales:

> It's part of the online retailer's effort to be the one-stop shop for anything and everything. Plenty of brands have opted to team up with Amazon and hand over full collections instead of engaging in a never-ending fight.  *Id.*

107. Just as Amazon refused Birkenstock's pleas for protection from knock-offs because Birkenstock refused to afford Amazon its "full line" so, logically, Amazon would conspire with Birkenstock to ban genuine Birkenstocks if only Birkenstock would agree to contract with Amazon.  See https://www.law360.com/articles/920031?scroll=1 (Amazon sued on

40

May 3, 2017 for "allowing rivals to sell knockoffs.")  Often, restrictions, warning letters and suspensions are not about product authenticity, but rather, about Amazon's fundamental business plan of market domination.  These unsavory means to an end are illegal.

108.   The Birkenstock episode, documented by its CEO and numerous journalistic investigations, establishes why Amazon's conduct is horizontal in nature.  Amazon insists upon being a fully stocked seller of Birkenstock and then, and then only, will Amazon act in concert with Birkenstock to eliminate not only unfair competition, but moreover, lawful competition of so-called *unauthorized third-party sales,* i.e. grey market goods.

## C.  Nike

109.   On or about June 22, 2017 the Birkenstock scenario repeated itself with Nike, world leader in the design, development, manufacturing, and marketing and sales of footwear, apparel, equipment, accessories, and services:

> Lately, the explosion of third-party sellers on the site has led to authentic goods from companies such as Nike, Chanel, The North Face, Patagonia and Urban Decay being sold on Amazon even though they don't authorize the sales, undercutting their grip on pricing and distribution.
>
> . . . .
>
> These days, there are so many third-party resellers, who generally are allowed to resell goods they have lawfully acquired at whatever price they want, that companies see few ways to stop them.
>
> . . . .
>
> Nike's recent deal represents one strategy: Add Amazon as a distributor to drown out the flood of third-party sales. Nike agreed to start selling some products

directly to Amazon in exchange for stricter policing of counterfeits and restrictions on unsanctioned sales, according to a person familiar with the deal.[59]

110. Following weeks of negotiations between Nike and Amazon, Amazon agreed to crack down on counterfeit product and the proliferation of *unauthorized third-party sales* on the site. The two companies reached an **agreement** where Nike would agree to provide product directly to—or partner with--Amazon (through is Zappoa subsidiary) in exchange for Amazon *policing* counterfeit and *unauthorized third-party sales*

111. The Nike episode, documented by its CEO Mark Parker on June 29, 2017, and numerous investigative pieces, establishes why Amazon's conduct is horizontal in nature:

> Nike's products can already be found on Amazon via unlicensed and licensed third-party vendors. But with a direct partnership, Nike will be able to "elevate the way the brand is presented" by gaining more control over how its products are marketed on the site, Parker said.[60]

The "unlicensed" vendors mentioned in the above quote are the *unlicensed* third-party vendors that Amazon will now "police" and exclude.  Amazon, a seller of Nike product, and Nike, which agreed to directly market its products on Amazon-Zappos, have agreed to "drown out the flood of third-party sales." See text accompanying n.59, *supra.*

112. The quoted media is referring to the arrangement as a "partnership."  While the precise nature of the relationship must await discovery, Amazon appears to have entered into the paradigmatic "combination" in restraint of trade according to the industry specialists quoted herein.

---

[59] http://www.foxbusiness.com/features/2017/06/28/how-nike-resisted-amazons-dominance-for-years-2.html
[60] http://money.cnn.com/2017/06/29/technology/business/nike-amazon-shoes/index.html

113. The horizontal maneuvers described in this Complaint eliminate a significant number of price-cutting competitors from the Marketplace.  As an example, Nike products' Marketplace was reduced to just a few sellers, scaled downward from a multitude:

> These days [pre-Section 1 violations], there are so many third-party resellers, who generally are allowed to resell goods they have lawfully acquired at whatever price they want, that companies see few ways to stop them.
>
> . . . .
>
> A company's power to dictate who could sell its products and how, penalizing retailers that step out of line by withholding inventory or other measures, has been a critical tool to preventing unwanted discounting, which damages the ability to sell at full price.[61]

The purpose and effect of the Nike-Amazon combination, and of several unlawful combinations chronicled herein, is to eliminate competition.

114. Incredibly, the Nike-Amazon  illicit combination is publicized ("in plain view") accurately, as concerted conduct to boycott or refuse to deal with competitors who, in a neutral competitive market, have every right to sell grey goods on the Marketplace:[62]

> As part of the *deal* between Amazon and Nike, Amazon will monitor its website and *no longer allow third parties to sell Nike merchandise . . .*

---

[61] http://www.foxbusiness.com/features/2017/06/28/how-nike-resisted-amazons-dominance-for-years-2.html
(last visited July 4, 2017).

[62] http://www.businessinsider.com/why-nike-is-selling-on-amazon-2017-6

115. Nike and Amazon are, one or both, horizontal competitors who now, through a **deal,** share a common enterprise in the Marketplace for Nike products, according to those who study and comment on the Nike-Amazon combination:

> This fits with Nike's broader plan to tighten its grip on brand and image as it focuses more on direct-to-consumer and moves away from wholesale.[63]

### D. National Football League

116. Arbitragers are prolific purchasers of Official National Football League products, ranging from auto accessories to sports equipment to headgear and dozens of product lines in between.  Products are designed for each NFL team and for many celebrity players.

117. NFL is a rightholder of trademarks, copyrights, and other intellectual properties which are licensed to manufacturers and others for use in manufacturing and marketing NFL products.

118. Arbitragers purchase NFL products from the NFL or from licensees or sub-licensees of the NFL.

119. Until in or about the summer of 2016 Arbitragers had no problem purchasing NFL products and selling them on the Marketplace.

120. In or about the summer of 2016, however, NFL and Amazon combined to eliminate many sellers of NFL products, some seasonally, in order to regulate competition amongst sellers on the Marketplace.

121. The NFL places severe limitations on NFL licensees as to whom they may sell NFL products.[64]   Licensees must ordinarily agree not to sell, or sell to another who sells, on e-

---

[63] *Id.*

[64] "The NFL has announced that they are restricting all 3rd party online sales. As a licensee we will not be able to sell to anyone who sells our NFL products online through any 3rd party portal. All

commerce platforms.  If such products find their way to the Amazon Marketplace without NFL permission despite NFL's efforts to unilaterally restrict sales at the pre-Marketplace level then, in that event, Amazon, pursuant to agreement and understanding with the NFL, will enforce the NFL restriction and ban (or already has banned) various NFL products. This is a classic concerted refusal to deal, *per se* unlawful under the Sherman Act. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S. Ct. 2923 (1978) ; *Weiss v. York Hosp.,* 745 F.2d 786 (3d Cir. 1984) .  The NFL is more important to Amazon than other owners of NFL merchandise and the two agreed to bar such disfavored owners' NFL merchandise from the Marketplace. *Id.*

122. Arbitragers were shocked when they first encountered the boycott:

> We have been selling licensed NFL merchandise for a little over 7 years now with no problem. Recently, many of our NFL listing are being blocked even though the inventory is already at a fulfillment center with a message saying the account is being reviewed. Everything is purchased from a licensed wholesaler in the US. Every item has the NFL tags and hologram stickers. Everything is 100% authentic merchandise.
> https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0

123. Amazon uses the pretext of sincere concerns about counterfeiting to justify this veteran seller's exclusion from the Marketplace despite the de-listed seller's extensive efforts and pleas to Amazon:

> We have cancelled your offers listed at the end of this message and are conducting a review of your selling account because there's a concern about the authenticity of these items"

---

sales of our NFL products must occur through the retailer's own e-commerce site. These restrictions include, but are not limited to, sales on amazon.com, buy.com and ebay.com."  I. Steiner: "Can the NFL Ban on Marketplace Sales Succeed?" (April 2016) reprinted at http://www.ecommercebytes.com/cab/abn/y16/m04/i12/s01

https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0

This is a sham.  There can be no genuine concern about the authenticity of the NFL products, all within Amazon's custody and available for examination, being marketed by a veteran with a sterling record, good reviews and every right to re-sell his property without interference of rightholders.  Amazon lack of consistent and sincere concern for counterfeit products was best expressed in recent litigation filed by Marketplace sellers who need, but cannot get, Amazon's help in stemming the counterfeit tide for their products:

> 'Amazon has taken no action to prevent the sale of such counterfeit products despite having the knowledge, opportunity and means to do so,' the plaintiffs said.[65]

124. A second Arbitrager sees the NFL Marketplace ban, similarly to Plaintiff, as the illegal boycott it is:

> So basically I have a retail store selling licensed NFL jerseys that I have bought direct from Adidas, Reebok, Majestic, Nike, etc.
> The NFL is saying if you (the retailer) sell NFL on a 3rd party marketplace we reserve the right to tell your supplier (Reebok, Nike) to cut you off. I'm willing to take that risk for Amazon customers. If my merchandise is legit, licensed, and bought direct Amazon should protect me not the NFL.
> They (NFL) use the counterfeit issue as the reason for this new marketplace ban but it is false. The real reason is the NFL and all leagues are backing fanatics.com which runs the websites for most leagues and teams. They want it all. Every dollar they can suck out of a fan. This will only drive up consumer prices and Im no lawyer and you will go bankrupt fighting these people in court but maybe a politician into consumer rights gets involved. Think about it, *the NHL took a financial interest in fanatics*, almost unamerican. The only goal is to charge consumer more and knock out small online guys.
> https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0

---

[65] http://www.businessinsider.com/the-maker-of-the-snuggie-blanket-is-suing-amazon-2016-12

Not only does this boycott destroy competition as Arbitragers' price competition is eliminated but, moreover, small businesses often cannot weather the disqualification of their inventory and they and their employees may disappear from the Marketplace altogether. [66]

125.  Because Amazon is a seller of NFL goods,[67] and because the NFL is a competitor in its own right or because of its interest in Fanatics, Inc., which "powers the e-commerce sites of all major professional sports leagues, [68] these actions of Amazon constitute horizontal restraints on competition in the relevant market.

## E. Kitchen Aid

126.  On March 29, 2017 Amazon gave notice to third-party sellers that they would not be permitted to list or sell Kitchen Aid products on Amazon marketplace, effective COB that 3/29/17  Kitchen Aid is the market leader in countertop food mixers, featuring KSM150-PSER ("Mixer").

---

[66] "This is what I don't understand, though. Amazon is always bending over backwards to benefit it's customers. But, by SEVERELY limiting the amount of sellers to buy from, they are forcing customers to accept HIGH prices."
https://sellercentral.amazon.com/forums/thread.jspa?threadID=175278.

"This is not a part time gig for me to make some pocket money, this is our career, our livelihood and how we make a living, as well as our employees. There is no one to call, no one to explain to us why they are doing this."
https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0

**NFL Embroidered Billfold Wallet**
⭐⭐⭐⭐⭐ ▼    673 customer reviews  |  32 answered questions

Price: **$24.63** & **FREE Shipping** on orders over $25. Details

In stock on June 20, 2017.
Order it now.

[67]  Ships from and sold by Amazon.com. Gift-wrap available.

[68] In March 2016, the NFL and Fanatics agreed to a new long-term extension to operate NFLShop.com.  See https://en.wikipedia.org/wiki/Fanatics_(sports_retailer).

127. Prior to March 29, 2017 Mixer generated spirited competition, with frequent rises and drops in price.  Soon after the elimination of third-party seller Mixer competition, however, spirited competition disappeared from Amazon and, with the theoretical exception of the Mother's Day period in May, the Marketplace (with Amazon itself as retailer) has offered Mixer at a constant price of $280.45 since on or about March 29, 2017:[69]



**EXCLUSIONARY CONDUCT IS SELECTIVE AND UNREASONABLE**

128. Professional sellers typically utilize Amazon's storage facilities and logistics offered by its Fulfillment by Amazon ("FBA") division.  Thus Amazon ordinarily has in its possession and delivers the very products—often in sealed packaging from manufacturers-- complained of by rightholders.  Any concern about the authenticity of a product can be

---

[69] https://camelcamelcamel.com/KitchenAid-KSM150PSER-Artisan-Tilt-Head Pouring/product/B00005UP2P?context=search

immediately resolved by examining of the product sitting in Amazon's own warehouse, often by directing a robot to fetch a sample of inventoried product.[70]  Mere allegations about "counterfeiting" ought never result in a third-party FBA seller's discipline or suspension . . . but, in fact, such purported concerns routinely result in threatened or real consequences, including de-listing, seller termination and suppression of price competition.[71]  This pretext is similar in purpose and effect to the purported Manufacturer Warranty Policy Rule pretext, ¶¶39-44 *supra.*

129.  "Amazon said it invests tens of millions of dollars in developing and deploying technology to weed out counterfeiters," and "filed lawsuits against counterfeit sellers, after a number of businesses on Amazon voiced concern that knockoffs were killing their sales and

---



[70]

[71] "The most frustrating part is, all of the items they are blocking, they actually have in their possession at a FBA facility. Why can't they just look and see the manufacturer tags with the licensed hologram stickers? Everything is 100% authentic and they can look and see this. So confused!!"  https://sellercentral.amazon.com/forums/thread.jspa?threadID=316607&tstart=0

endangering consumers."[72]  Amazon's methodical punishment of legitimate sellers, in light of available, reasonable means of controlling the counterfeiting problem, is arbitrary, unreasonable and unlawful.

130.   Accordingly, it is a significant, wide-spread problem for third party sellers—and for relevant market competition-- that Amazon at times does not base Marketplace exclusion of brands, categories and ASIN's on the *fact* of counterfeit products but, rather, at times uses "counterfeiting" as a *pretext* for anticompetitive exclusion of competitors, their products, and their price competition.[73]  It is well-known that third-party sellers ought not plan on selling goods "sold by big brand names or major Amazon sellers."[74]  Contrary to its stated policies, Amazon frequently and in its sole discretion neither (i) requires a complaining rightholder to prove a claim of counterfeiting, nor (ii) subjects non-credible claims of infringement to legal or factual scrutiny, nor, remarkably, does Amazon (iii) check the challenged third party seller's inventory in its own warehouse.

131.   A cottage industry of consultants (including lawyers) has emerged to represent third-party sellers vis-à-vis potential suspension by Amazon.  The goal of these representatives is ordinarily to avoid or reverse seller suspension, i.e. not to restore a seller's right to sell grey-market products that were illegally restricted from competing in the first instance.

---

[72] http://www.cnbc.com/2016/11/15/amazon-takes-counterfeit-sellers-to-court-for-first-time.html
[73] "I agree. I would also be interested in filing a lawsuit. They suspended my account and have $3500 of my money. My daughter is 8 and sent in her girl scout cookies to sell. Someone said they were inauthentic!! How can Girl scout cookies be inauthentic?? They will not pay us for the cookies sold on amazon so my daughter will lose all her awards and prizes. Girl Scouts will take me to court for not being able to pay. This is not fair and something needs to be done." https://www.amazon.com/seller-account-suspended-jeffbezos/forum/Fx381N3DWYJYIGD/TxEVLB3PU19O1Z/1/ref=cm_cd_NOREF?_encoding=UTF8&asin=B000X86ZAS&cdItems=25&cdSort=newest&store=generic
[74] http://fitsmallbusiness.com/what-to-sell-on-amazon/

See https://www.bloomberg.com/news/articles/2016-08-26/amazon-angers-mom-and-pop-sellers-with-arbitrary-suspensions

132.  So massive and threatening is the problem of Amazon suspensions that a new line of insurance has been developed, purportedly associated with Lloyds of London, to provide coverage of business income should a seller be suspended and not promptly reinstated through the insurer's intervention.  The insurance policy in no way proposes to seek reversal of the product restrictions imposed by Amazon and rightholders, but rather, only to cover lost income failing reinstatement.  See

http://www.carriermanagement.com/news/2017/03/23/165503.htm

## PLAINTIFF'S DAMAGES AND IRREPARABLE HARM

133.  Amazon intends to continue the unlawful exclusionary practices challenged hereby, as exemplified by the NFL, Kitchen Aid, and Nike collaborations as recently as July 2017.

134.  The injuries that Plaintiff is incurring and will continue to incur will not be fully compensable by monetary damages.  As of commencement Plaintiff has suffered at least $12,000 lost sales per month, which is an achievable sales level Professional Seller status, together with litigation expenses incidental hereto.  Profit margins of 15% are in Plaintiff's contemplation at this modest level of sales activity.[75]  It is impossible to estimate the financial results of Plaintiff's online retail sales activities in a competitively neutral Marketplace, i.e. Plaintiffs goal in this litigation.

135.  The threatened injuries to Plaintiff are irreparable, warranting both damages and the issuance of injunctive relief.

---

[75] http://www.webretailer.com/lean-commerce/amazon-sellers-survey-2016/#/

## COUNT I

## SHERMAN ANTITRUST ACT: QUICK LOOK DOCTRINE

136. Plaintiff incorporates the allegations above as though re-written at length and restates that Plaintiff has been injured in its business and property by the anticompetitive conduct hereinbefore alleged of Amazon in concert with others.

137. The first sale and fair use doctrines protect resellers of genuine trademarked goods from claims of infringement. *Davidoff & CIE, S.A. v. PLD Int'l. Corp.,* 263 F.3d 1297, 1301 (11th Cir. 2001). *Hidalgo Corp. v. J. Kugel Designs, Inc*., No. 05-20476-CIV- 2006 U.S. Dist. LEXIS 96647, at *12 (S.D. Fla. 2006)

138. Copyright law provides copyright holders only a limited monopoly in order to enhance retail competition and maximize dissemination of copyrighted works to the general public. The first-sale doctrine prevents copyright holders from extending the monopoly beyond the initial sale of the copyrighted work. Thus, Congress expressly provided that "[T]he owner of a particular copy … lawfully made under [Title 17 of the United States Code] … is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy …" 17 U.S.C. ¶ 109(a).

139. The public policy behind copyright law favors the enhancement of retail competition and the maximization of dissemination of copyrighted works. Anti-competitive agreement or anti-competitive behavior, such as an unlawful group boycott, conflicts with this public policy, subverts the goals of copyright law and constitutes "copyright misuse." The doctrine of copyright misuse prevents copyright holders from using their copyright and extend their government-sanctioned monopoly beyond its proper scope. The existence of

such anti-competitive agreements or unlawful activity precludes the enforcement of the copyright during the period of copyright misuse.

140. Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) states that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

141. As set forth above, Amazon has, in concert with rightholders, established definitive exclusionary methodologies, applied selectively, to preclude hundreds and thousands of Arbitragers and other third-party sellers from competing or effectively competing in the Marketplace.

142. Plaintiff has purchased and owns goods for resale on the Marketplace. Plaintiff has taken all measures of preparedness to engage in competition on the Marketplace. Amazon's policies and practices inhibiting and stifling competition presents an unreasonable risk of loss that neither Plaintiff nor any other Seller should be required to assume as a condition of competing in the Marketplace.

143. Amazon has refused to acknowledge Plaintiff's request that Amazon provide assurances that it will not delist Plaintiff's lawful listings absent determining that Plaintiff has, in fact, deposited inauthentic goods for FBA logistics and delivery.

144. Amazon's constant use of complaints alleging copyright and trademark infringement to justify the intentional, calculated suppression of marketplace competition is a misuse, or contributory misuse of such intellectual property.

145. There is an actual controversy over Defendant's continuation of concerted conduct with favored brands and sellers to quash competition vis-à-vis disfavored third-party sellers.

Such conduct is illegal because it constitutes a combination in restraint of trade within the online retail sales relevant market.

146. Amazon has not taken reasonable steps to avoid chilling the commercial rights preserved under the First Sale Doctrine.  It must at minimum check the very products under challenge where they are sitting in Amazon's own fulfillment centers and must require complaining rightholders to test-purchase products and establish counterfeiting *prior to* banning listings and punishing third-party sellers.

147. Amazon may not lawfully enter into brand restriction agreements with the likes of Apple, Logitech, Jabra, Nike, Birkenstock, Kitchen Aid and others for the primary purpose, and with the primary effect, of stifling price competition as between grey market sellers and rightholders, Producers and others; nor may Amazon implement, as it does albeit selectively, a Manufacturers Warranty Exclusionary Rule when same is pretextual and even in any event more restrictively anticompetitive than reasonably necessary.

148. The boycotts of third-party sellers orchestrated by Amazon and co-conspirator rightholders in the main, constitute naked restraints on output that decrease supply of consumer products across the Marketplace, reduce consumer choice of sellers and artificially raise prices, negatively affecting consumers and small businesses alike.  See discussion of Kitchen Aid, *supra.*

149. The restraints are horizontal where Amazon is a seller of banned products and agrees  with Producers, who are horizontal competitors or potential competitors, to exclude competitors as described herein throughout.

150. The subject practices and agreements are so plainly anti-competitive and lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason.

151. Amazon's selective "enforcement" of intellectual property rights, ignoring some cases and "jumping on" others, exacerbates the wrongdoing and permits an inference of wrongful motive.

152. Amazon wrongfully restricts product listings day in and day out, pretextually and not only or principally to stem the inflow of counterfeit goods.  In any and all events, antitrust principles do not permit the use of conspiracies directed at innocent competitors in order to meet the challenge of unrelated counterfeit goods.

## COUNT II

## SHERMAN ANTITRUST ACT: RULE OF REASON

153. Plaintiff incorporates the allegations above as though re-written at length.

154. Each copyrighted and trademarked product has its own ASIN and is unique.  It has been granted a limited governmental monopoly within its nationwide geographic market.

155. A copyright holder enjoys a "distribution right" and may initially sell, or not sell, copies of a copyrighted work to others on such terms as he or she sees fit. However, the copyright holder's exclusive distribution right is limited to the first sale of the coyprighted item. Under the "first sale" docrine, codified at 17 U.S.C. § 109(a) "the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies."

156. Defendants' product and brand restrictions on competition, as well as its threats of terminating selling privileges, exceeds the scope of the government-granted distribution right, and violates the antitrust laws as an illegal restraint of trade.

157. As such, by combining with Producers and others to boycott and refuse to deal with third-party sellers, Amazon has violated Section 1 of the Sherman Act and unlawfully entered into agreements, arrangements, combinations and contracts to restrain commerce within the United States.

158. The boycotts and refusals to deal imposed by Amazon in concert with competitors and co-conspirators will eliminate or signifiantly decrease the supply products to the Marketplace, will reduce consumer choice in the Marketplace and will artificially increase prices that consumers have to pay to purchase products.

159. In light of the factors enumerated in ¶20 *supra,* the restraints have no justifying pro-competitive effect.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment with respect to its Complaint as follows:

1. Declaring that Amazon's brand and product restrictions have been practiced in violation of Section 1 of the Sherman Act, and enjoining such practices accordingly;

2. Nullifying all brand and product restrictions now in force in the Marketplace unless and until Amazon shows good cause, on a case by case basis, for the maintenance of such restrictions, including a showing that a given restriction was

not established in concert with participants in the Marketplace but, rather, was established as Amazon's unilateral (or otherwise permitted) act;

3.  Damages as proved at trial, and thence trebled;

4. Awarding Plaintiff its costs and disbursements in this action, including reasonable attorneys' fees; and

5. Granting Plaintiff such other and further relief as may be appropriate.

/s/Mark Schlachet____
Law Offices of Mark Schlachet
3515 Severn Road
Cleveland, Ohio 44118
Telephone: (216) 225-7559
Facsimile: (216) 932-5390
Email: markschlachet@me.com

Attorney for Plaintiff